IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH DRENTH and THE NATIONAL FEDERATION OF THE BLIND OF PENNSYLVANIA, | Civil No. 1:20-CV-00829 |
| Plaintiffs, | Judge Jennifer P. Wilson |
| v. | |
| KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth, and DEPARTMENT OF STATE OF THE COMMONWEALTH OF PENNSYLVANIA, | |
| Defendants. | |

**PLAINTIFFS' PRETRIAL MEMORANDUM**

Plaintiffs through their counsel, submit this Pretrial Memorandum in accordance with Local Rule 16.6. The parties held a conference required by Local Rule 16.3(b) on July 27, 2010.

**A. Federal Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983 as this case arises under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132-12134, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.

**B. Summary of Facts and Contentions as to Liability**

Plaintiffs, Joseph Drenth and National Federation of the Blind of Pennsylvania ("NFB-PA"), allege that Defendants, the Pennsylvania Department of State and the Secretary of the Commonwealth (collectively, "DOS"), violate Title II of the ADA and Section 504 of the RA by denying blind voters, such as Mr. Drenth and certain NFB-PA members, equal and meaningful access to DOS's absentee and mail-in voting program and refusing to make reasonable modifications to that program necessary to afford them equal access and provide effective communication. Plaintiffs seek a permanent injunction requiring Defendants to implement reasonable modifications to ensure that their absentee and mail-in voting program is accessible to blind voters, including implementing an accessible ballot marking and delivery tool and implementing accessible methods by which blind voters can return their marked ballots. Plaintiffs also seek permanent injunctive relief to ensure that Defendants implement the changes and that they work effectively to eradicate discrimination against blind voters.

All Pennsylvania voters are eligible to vote by mail-in ballot and some can also vote by absentee ballot. Both the absentee and mail-in voting program allow Pennsylvania voters to receive ballots and vote from their own homes, without having to travel to vote in person at their polling places during the global COVID-19 pandemic.

Mr. Drenth and NFB-PA members want equal and meaningful access so that they can use Defendants' absentee and mail-in voting program to vote privately and independently, like non-blind voters. Equal and meaningful access to Pennsylvania's absentee and mail-in voting program is particularly critical at this time due to the COVID-19 pandemic, when in-person voting exposes voters to the risk of infection. Plaintiffs, like non-blind voters, should not have to choose between protecting their health and voting privately and independently.

Pennsylvania's absentee and mail-in ballot program is entirely paper-based, and thus, inaccessible. After a Pennsylvania voter applies to vote by absentee or mail-in ballot and is determined by his or her County Board of Elections ("CBE") to be qualified to vote, the CBE will send a package to the voter that includes: (a) the paper ballot; (b) the paper secrecy envelope; and (c) the paper return envelope.

Upon receipt of that package, the voter must do the following to ensure that his/her vote will be counted: (a) mark the ballot by hand; (b) place the marked ballot into the secrecy envelope and seal it; (c) place the secrecy envelope into the return envelope and seal it; (d) review the declaration on the exterior of the return envelope; (e) sign the declaration; and (f) deliver it to the CBE, so it is received no later than 8:00 p.m. on election day.

While sighted voters can review, mark, assemble, sign, and return their paper absentee and mail-in ballots privately and independently, blind voters

cannot. Blind voters do not want to, yet must, rely on sighted individuals to read the paper ballots to them; must tell sighted individuals which candidates they want to vote for; must rely on sighted individuals to accurately complete the ballots in accordance with their wishes; must rely on sighted individuals to place the ballot properly within the secrecy envelope and then within the return envelope; and must rely on sighted individuals to read the declaration to them and tell them where the declaration should be signed.

DOS's AWIB process – implemented pursuant to the Court's preliminary injunction Order for the June 2020 primary election – is not accessible, either. Aside from many formatting errors and lack of instructions to print the envelope, the core problem is that the AWIB process requires voters to navigate between two documents – the candidate list and the ballot. Voters must either memorize the spelling of the names of their choices from the candidate list and then type them into the fill-in ballot or copy names from the candidate list and paste them into the fill-in ballot. Either strategy results in cognitive overload for blind voters. DOS makes no effort to defend the accessibility of the AWIB process and confirmed that it does not intend to use it in any future elections.

Accessible ballot marking and delivery tools electronically deliver accessible ballots to blind voters via email which can be read to them using their screen reader software (used by many blind people) and which they can mark on their

computers. Unlike the paper-based absentee and mail-in ballot process, these tools allow blind voters to vote privately and independently without relying on sighted persons for assistance. Unlike the AWIB process, these tools integrate into a single document the candidate list and the means for the blind voters to designate their choices, eliminating the problem of cognitive overload. For that reason, ballot delivery and marking tools are accessible for blind voters and should be implemented (although additional changes also are needed to address the inaccessibility of the return and declaration processes in order for the entire program to be accessible to blind voters).

It is feasible for DOS to implement an accessible ballot delivery and marking tool. Such tools are available commercially and through open-source platforms. A number of other states currently allow blind voters to vote using those tools. DOS does not dispute that it has the funds to implement the system and that it can overcome any security concerns. Most significantly, DOS effectively concedes that such a system is feasible as it has informed Plaintiffs and the Court that it intends to implement such a system beginning in the November 2020 election.

Despite DOS's long-standing promises, as of today, DOS still has not finalized any agreement to secure such a tool. Moreover, DOS has refused to provide any details of the agreement it claims is imminent, including: (a) the

identity of the vendor and type of system it intends to secure; (b) how the tool will be implemented (e.g., will DOS or the CBEs be responsible to accept applications to use and to provide access to the tool); (c) the terms of the agreement, including its length; and (d) how, or even if, the tool will be tested prior to implementation. Without this information, it is impossible to determine whether DOS's purported plan will meet blind voters' accessibility needs. Even if DOS finalizes an agreement to secure an accessible ballot marking and delivery device before trial in this matter, this Court should still order appropriate permanent injunctive relief – especially because it appears that Defendants' new tool will not solve all of the accessibility problems raised by Plaintiffs.

An accessible ballot marking and delivery tool does not address the inaccessibility of the return and declaration processes that are part of Defendants' paper-based absentee and mail-in voting program. Defendants effectively concede that the processes by which voters must return their absentee and mail-in ballots is inaccessible to blind voters as is the declaration that voters must sign. They are correct. Some blind voters would struggle to use secrecy and return envelopes without assistance from a sighted person (or even to identify the receipt of such envelopes in the mail). Blind voters also cannot read the declaration printed on the return envelope or know where it should be signed, but their votes may not be counted if they sign the reverse side of the return envelopes.

Reasonable modifications to the mail and declaration processes for the absentee and mail-in voting program are feasible. Defendants' promise to "request" that the CBEs send different-sized envelopes to blind voters and accept signatures anywhere on the return envelopes submitted by blind voters is inadequate factually and legally. Defendants have not yet even made these limited "requests." Since Defendants concede that their enforcement authority vis-à-vis the CBEs is "unclear," such requests provide little assurance that the changes will be implemented.

Reasonable modifications to the mailing and declaration processes must include all of the following to ensure that the absentee and mail-in voting program is accessible to blind voters: ensuring that voters receive return envelopes that are substantially larger than the secrecy envelopes; punching holes on either side of the signature lines on all voters' return envelopes to better guide blind votes to sign in the appropriate space and to protect their privacy; ensuring that blind voters' signatures anywhere on the envelope will be sufficient to count their votes; electronically delivering accessible instructions for mailing and the text of the declaration; and ensuring that DOS either deliver the envelopes and other materials itself (rather than have the CBEs do it) or develop and implement sanctions for noncompliance by CBEs. Even if Defendants adopted policies to implement all of

these necessary changes, Plaintiffs still would be entitled to permanent injunctive relief to ensure that the policies are not rescinded.

Beyond its need to modify the mail return processes to ensure equal access to the absentee and mail-in voting program for blind voters, it also is a reasonable modification for Defendants to allow blind voters to submit their ballots electronically. For some blind voters, modifications to the mail return and declaration processes are not enough to ensure equal and meaningful access to the absentee and mail-in ballot process. In order to return the ballots marked using the accessible ballot marking and delivery system by mail (or hand-delivery), blind voters must first print out their marked ballots. Requiring blind voters to print their ballots is discriminatory. Unlike blind voters, sighted voters need not print their absentee and mail-in ballots; they simply mark the paper ballots they receive from their CBEs. Moreover, most blind people do not have printers because they do not read printed material. In order to print their marked ballots, blind voters would need to deliver an electronic copy of their marked ballots (if possible) to a third-party or public polling place, which would eviscerate the privacy of their votes.

Electronic submission is a reasonable modification to enable blind voters to submit their ballots without having to print them and, thus, ensure that they can vote privately and independently by absentee or mail-in ballot. Defendants' purported security concerns can be effectively mitigated using encryption and

other strategies. Other states allow blind voters to return ballots via online portals or by email. More than 25 states allow UOCAVA voters to submit marked ballots by fax, email, or via online portals.

### C. Statement of Undisputed Facts

Plaintiffs submit a list of stipulations to which the parties have agreed as Attachment 1.

### D. Brief Description of Damages

Not applicable.

### E. Names and Addresses of Witnesses

#### 1. Witness List

Lou Ann Blake
c/o National Federation of the Blind
200 East Wells Street at Jernigan Place
Baltimore, MD 21230

Shane M.K. Doyle, Paralegal
Brown Goldstein Levy LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21201

Joseph Drenth
c/o National Federation of the Blind of Pennsylvania
61 Heartwood Road
Levittown, PA 19056

Lynn Heitz
c/o National Federation of the Blind of Pennsylvania
61 Heartwood Road
Levittown, PA 19056

Jonathan Lazar, Ph.D., LL.M., Professor
College of Information Studies
University of Maryland
Hornbake Building, South Wing, Room 2117-J
4130 Campus Drive
College Park, MD 20742

Regina Plettenberg
Clerk & Recorder/Election Administrator Ravalli County, Montana
215 S. 4th Street, Suite C
Hamilton, MT 59840

Mark A. Riccobono, President
c/o National Federation of the Blind
200 East Wells Street at Jernigan Place
Baltimore, MD 21230

Justin Salisbury
c/o National Federation of the Blind of Pennsylvania
61 Heartwood Road
Levittown, PA 19056

Mark Senk
c/o National Federation of the Blind of Pennsylvania
61 Heartwood Road
Levittown, PA 19056

Rebecca Weber
c/o National Federation of the Blind of Pennsylvania
61 Heartwood Road
Levittown, PA 19056

### 2. Experts' Qualifications and Specialties

Juan Gilbert, Ph.D. – Dr. Gilbert (B.S. in Systems Analysis, M.S., and Ph.D. in Computer Science) is the Chair of the Computer & Information Science & Engineering Department at the University of Florida. He is an expert in elections

technology, including the usability and accessibility of voting technologies. Dr. Gilbert invented Prime III, an open-source accessible voting platform that has been used in local, state, and federal elections in the United States. He has published more than 250 articles and obtained more than $28 million in research funding.

Justin Pelletier, Ph.D. – Dr. Pelletier (B.S. in Computer Science, MBA in Entrepreneurship, and Ph.D. in Information Assurance and Security) is a member of the Computing Security Department at Rochester Institute of Technology ("RIT") and the Director of Cyber Training, Testing, and Outreach for RIT's Global Cybersecurity Institute. Dr. Pelletier trains and leads student teams to perform device and network security assessments for partner organizations. He is an expert in cybersecurity who explores and teaches authentication and security models, which apply cryptographic techniques to identify and authenticate users at distance.

Ted Selker, Ph.D. – Dr. Selker (B.S. in Applied Mathematics, M.S. and Ph.D. in Computer Science) is a computer science researcher with expertise in human-computer interaction and particular expertise in voting technologies and their usability, including usability by individuals with disabilities. He has served as the co-director of the MIT/Caltech Voting Project; helped launch a multi-university effort known as the Research Alliance on Accessible Voting, whose purpose is to examine ways to make voting more accessible; published articles on

voting technologies and their usability; and testified on voting technologies before the U.S. House of Representatives and the U.S. Senate.

### F. <u>Summary of Experts' Testimony</u>

Dr. Gilbert will testify that Pennsylvania's paper absentee and mail-in ballots are not accessible to blind or visually-impaired voters; that the AWIB system used in the June 2020 primary election is not accessible to blind or visually impaired voters; and that Pennsylvania can and should implement a ballot delivery and marking tool for blind and visually-impaired voters. Dr. Gilbert also will testify about the need to test new voting systems prior to implementation.

Dr. Pelletier will testify that security controls exist that reduce residual risk associated with electronic ballot submission over email, and that many of these controls could be implemented by U.S. states using commercially available and widely used technology. He will explain that a variety of controls are available in order to promote the security of electronic submission of marked ballots.

Dr. Selker will testify that Pennsylvania's expert has not fully considered solutions that Pennsylvania could implement to promote the secure return of marked ballots over email and that Pennsylvania can securely and feasibly allow blind voters to return marked ballots electronically through the use of strategies such as encryption and multi-factor authentication.

### G. <u>Comments about Pleadings and Discovery</u>

None.

### H. Summary of Legal Issues Involved and Legal <u>Authorities Relied Upon</u>

#### 1. Does Defendants' Paper-Based Absentee and Mail-In Ballot Program and AWIB Process Violate the ADA and RA By Denying Blind Voters Equal and Meaningful Access to that Program?

The ADA and RA prohibit covered entities, like DOS, from discriminating against individuals with disabilities. 29 U.S.C. § 794; 42 U.S.C. § 12132. Unlawful discrimination under the ADA and RA includes: (1) affording people with disabilities an opportunity to participate in or benefit from programs that is not equal to that afforded to others, and (2) providing people with disabilities with programs that are not as effective in affording equal opportunity to obtain the same result as that provided to others. 28 C.F.R. §§ 35.130(b)(1)(ii)-(iii), 41.51(b)(1)(ii)-(iii); *see also Alexander v. Choate*, 469 U.S. 287, 201 (1985) (requiring that covered entities ensure "meaningful access" to programs, services, and activities). It is beyond dispute that Pennsylvania's paper-based absentee and mail-in ballot program does not allow blind voters to vote privately and independently, as non-blind voters can. The inability of blind voters to vote privately and independently using Defendants' absentee and mail-in voting program denies them meaningful access to that program. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d

494, 507 (4th Cir. 2016); *Drenth v. Boockvar*, No. 1:20-cv-00829, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020).

The Defendants' AWIB process is as inaccessible as their paper-based absentee and mail-in voting program. The structure of the AWIB process, which required voters to repeatedly navigate between two different documents and transfer information from one to the other, resulted in cognitive overload for blind voters. As this Court acknowledged: the AWIB process was not "entirely adequate to achieve compliance with the ADA and RA[.]" *Drenth*, 2020 WL 2745729, at *6. Defendants themselves have effectively repudiated the AWIB process, confirming that they will no longer use it.

### 2. Does the ADA and RA Require Defendants to Implement an Accessible Ballot Marking and Delivery Tool?

To ensure meaningful access to covered entities' programs, services, and activities, the ADA and RA require that they make "reasonable modifications" in their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. *See* 28 C.F.R. § 35.130(b)(7)(a); *Alexander*, 485 U.S. at 300-01 & n.20; *Disabled in Action v. Bd. of Elec.*, 752 F.3d 189, 197 (2d Cir. 2014). To prevail on a reasonable modification claim, a plaintiff need only put forward a proposed reasonable modification; the burden then shifts to the defendant to show that providing the modification would impose a

fundamental alteration. *See Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004); *Lamone*, 813 F.3d at 507; *Disabled in Action*, 752 F.3d at 202.

Implementation of an accessible ballot marking and delivery tool is a reasonable modification to enable blind voters to receive and mark their ballots privately and independently, just as sighted voters do. Defendants cannot and do not assert that implementation of an accessible ballot marking and delivery tool would result in a fundamental alteration of its program. Defendants' failure to implement such a tool violates the ADA's and RA's reasonable modification mandate. *Lamone*, 813 F.3d at 507-10.

Likewise, Defendants have a duty under the ADA to "take appropriate steps to ensure that communications with" participants with disabilities "are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). This mandate may require public entities to furnish "appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in and enjoy the benefits of" the entities' services, programs, or activities. 28 C.F.R. § 35.160(b)(1). Auxiliary aids and services must be provided "in such a way as to *protect the privacy and independence* of the individual with a disability." *Id.* (emphasis added). Congress understood that the ADA's communication provisions would require covered entities to implement technological advances to

maximize the independence of people with disabilities. *California Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1240 (N.D. Cal. 2013) (quoting H.R. Rep. 101-485(II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391). Defendants' paper-based absentee and mail-in voting program does not provide effective communication for blind voters since they cannot privately and independently use that system to vote. An accessible ballot marking and delivery tool is an auxiliary aid that would enable blind voters to vote privately and independently. Defendants' failure to implement such a device violates the ADA's effective communication mandate.

#### 3. Does Defendants' Mere Promise – or Even Actual Execution – of a Contract to Implement an Accessible Ballot Marking and Delivery Tool Render Plaintiffs' ADA and RA Claims Non-Justiciable?

Defendants cannot evade liability for their violations of the ADA and RA by failing to implement an accessible ballot marking and delivery tool by claiming that its intent to secure such a tool renders it non-justiciable. At all times, this case has been ripe for adjudication. Defendants' violations of the ADA and RA due to their failure to ensure that blind voters have equal and meaningful access to their absentee and mail-in ballot voting program existed at the outset of this litigation and persist to this day. Plaintiffs' claims have never rested upon contingencies; despite Defendants' arguments to the contrary, Plaintiffs' claims are ripe for

adjudication. *See Texas v. United States*, 523 U.S. 296, 300 (1998); *Plains All American Pipeline, L.P. v. Cook*, 866 F.3d 540, 541 (3d Cir. 2017).

Defendants' mere promise to acquire such a tool does not render the issue unripe for disposition by the Court. Even if Defendants acquire such a tool, it will not end the dispute. Defendants trumpet this promised remedy without divulging any details on how such a tool would work and how it would ensure that blind voters throughout Pennsylvania have equal and meaningful access to the absentee and mail-in ballot program. In addition, until the tool is actually implemented in November and thereafter, there will remain open questions as to whether Plaintiffs have the access to which they are entitled under the ADA and RA. So, too, acquisition of the tool will not address further modifications needed to the return and declaration processes. Finally, Defendants have never admitted that the ADA and RA require them to implement an accessible ballot marking and delivery tool, which fatally undermines their claim that the parties' interests are not adverse.

Nor can Defendants rely on mootness as a basis to avoid liability. First, the mere promise of future action is insufficient to moot Plaintiffs' claims. *See, e.g.*, *CSI Aviation Services, Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 414 (D.C. Cir. 2011). Second, their voluntary cessation of unlawful conduct will not moot Plaintiffs' claims. *See Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020). Third, the availability of meaningful relief beyond mere acquisition of

the tool will also warrant rejection of any mootness argument. *See Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env. Prot.*, 833 F.3d 360, 374 (3d Cir. 2016).

**4. Does the ADA and RA Require Defendants to Make Reasonable Modifications to the Mail and Declaration Processes?**

In Pennsylvania, the entire paper-based absentee and mail-in ballot voting program is inaccessible to blind voters—including how blind voters return their ballots and mark their declarations. Plaintiffs have satisfied their burden to identify reasonable modifications to the return and declaration process to ensure that the absentee and mail-in voting program is more accessible than it currently is. These include: (1) ensuring that the return envelope is at least several inches larger than the secrecy envelope; (2) placing hole punches on either side of the signature line for the declaration on all return envelopes to guide blind voters as to where to sign without distinguishing them from other voters as well as ensuring that, in the event blind voters do not sign on the return line, their votes will be counted if they sign anywhere on the return envelope; (3) electronically delivering instructions on mailing and the text of the declaration in an accessible manner; (4) testing all parts of the system prior to implementation; and (5) either having DOS deliver the envelopes to blind voters or develop and implement sanctions on CBEs which fail

to comply with requirements to ensure that the envelope and declaration processes are accessible to blind voters.

Defendants do not contend that it would be a fundamental alteration to modify the return and declaration processes of their absentee and mail-in voting program. Instead, they promise that, at some future time, they will fix any accessibility issues related to those processes by issuing directives to the CBEs to request that they provide blind voters with return envelopes at least two inches larger than the secrecy envelopes sent to blind voters and to accept the return envelopes of blind voters regardless of where they sign on the return envelopes.

This is inadequate. Defendants have yet to issue any directives, so the scope of those directives cannot be assessed. Moreover, DOS concedes that its enforcement authority with respect to the counties is unclear, so the value of any such directives is equally unclear. Unless DOS is responsible to handle these matters directly, it is imperative that it develop and implement a sanction system for CBEs that do not comply. Additionally, allowing blind voters to sign "anywhere" on the envelope while failing to provide an accessible means for them to locate a signature line destroys their privacy. Defendants' solution also does not address the need for blind voters to receive instructions and the text of the declaration electronically in an accessible format.

More significantly, Defendants' promises to issue directives do not preclude issuance of a remedy for Plaintiffs on these matters. Defendants offer no legal basis to justify why such changes – even if they were adequate – would immunize them from liability and relief. The only possible argument – mootness – is unavailing for the same reason as Plaintiffs' claims would not be mooted by implementation of an accessible ballot marking and delivery system. *See* discussion, *supra*, at 17-18.

**5. Does the ADA and RA Require Defendants to Permit Electronic Submission of Absentee and Mail-In Ballots by Blind Voters as a Reasonable Modification?**

Modifications to the mail and declaration processes will not be sufficient to afford some blind voters equal and meaningful access to Defendants' absentee and mail-in voting program. Due to their inability to print their ballots marked using an accessible ballot marking and delivery tool without sacrificing the privacy of their votes, those blind voters will only have equal and meaningful access to the absentee and mail-in voting program if they can submit their ballots using some electronic means (such as email or an online portal). Electronic submission is a reasonable modification of Defendants' absentee and mail-in voting program.

Defendants have not met their burden of showing that electronic submission would result in a fundamental alteration. Other states allow electronic submission of ballots by blind voters and an even larger number of states allow electronic

submission of ballots by UOCAVA voters. The security concerns identified by Defendants are not insurmountable and can be addressed using encryption and other strategies.

Defendants' assertion that electronic submission is not required because no Pennsylvania voters are permitted to electronically submit their ballots misconstrues the ADA and RA, which require covered entities to treat people with disabilities differently than others in order to ensure that they receive equal access. *See United States v. Barnett*, 535 U.S. 391, 397 (2002); *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 644-45 (E.D. Pa. 2016).

Nor is the availability of in-person voting an appropriate alternative to electronic submission. The "program" at issue is the absentee and mail-in voting program – not all of Defendants' voting programs. *See Lamone*, 813 F.3d at 504. Defendants cannot define the program to effectively deny individuals with disabilities meaningful access. *Alexander*, 469 U.S. at 301; *Lamone*, 813 F.3d at 504; *Anderson*, 185 F. Supp. 3d at 645. Plaintiffs have the same right to vote without going to their polling places as non-blind voters.

### 6. Should the Court Enter a Permanent Injunction Requiring a Comprehensive Remedial Plan?

In determining whether to issue a permanent injunction, the Court must consider whether: (1) the moving party has succeeded on the merits; (2) the moving party will be irreparably injured by denial of relief; (3) the entry of a

permanent injunction will result in even greater harm to the Defendants; and (4) an injunction would be in the public interest. *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001). All elements are satisfied. Plaintiffs have established that Defendants violated the ADA and RA and, so, have succeeded on the merits. Plaintiffs suffer irreparable harm by being "effectively forced to choose between forfeiting their right to vote privately and independently or risking their health and safety by traveling to a polling place to vote in person" and that "[s]uch a choice burdens" their First Amendment right to vote. *Drenth*, 2020 WL 2745729, at *5; *see also Nat'l Fed'n of the Blind v. Lamone*, No. RDB-14-1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014) (granting permanent injunction in ADA and RA challenge to state's failure to implement accessible ballot marking tool), *aff'd,* 813 F.3d 494 (4th Cir. 2016). The balance of equities also favors relief since Defendants contend that they are not unwilling to implement many changes to make the absentee and mail-in voting program accessible to blind voters and the security issues they raise concerning electronic submission can be overcome. *Cf. Lamone*, 2014 WL 4388342, at *15. Finally, the public interest weighs in favor of the injunction since the public benefits when individuals can vote privately and independently, *Nat'l Fed'n of the Blind v. Lamone*, 2014 WL 4388342, at *15, and Congress intended the ADA and RA to address discrimination against people with

disabilities in the area of voting. *See* 42 U.S.C. § 12101(a)(5); 29 U.S.C. § 701(a)(5).

The Court has broad equitable powers to fashion an appropriate remedy for Defendants' civil rights violations. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Disabled in Action*, 752 F.3d at 198. A comprehensive equitable remedy must ensure not merely that Defendants sign a contract to purchase an accessible ballot marking and delivery tool and issues directives to the CBEs to make minor changes to the return and declaration processes. Rather, it must ensure that the changes are sufficient to eradicate discrimination and to ensure that those changes are actually implemented and work effectively. *Cf. Disabled in Action v. Bd. of Elec.*, 752 F.3d at 202-03 (upholding permanent injunction of remedial order requiring ongoing monitoring and reporting). In this case, appropriate permanent injunctive relief will require Defendants to secure and implement an accessible ballot marking and delivery tool; make reasonable modifications to the return and declaration processes of the absentee and mail-in voting program; allow blind voters to electronically submit their ballots; and ensure testing, monitoring, and oversight of these changes through the elections in 2021 to ensure that the discrimination against blind voters is eradicated.

## I. Stipulations Desired

None

**J. Estimated Number of Trial Days**

Plaintiffs expect to present their case in two days and for that the total days for trial will not exceed three.

**K. Any Other Pertinent Matters**

None

**L. Schedule of Exhibits**

Plaintiffs' Schedule of Exhibits is submitted as Attachment 2.

**M. Special Verdict Questions**

Not applicable.

**N. Defense Counsel Statement re Settlement Authority**

Not applicable.

**O. Local Rule 30.10 Certificate**

Not applicable.

**P. Findings of Fact and Conclusions of Law**

Plaintiffs' Proposed Findings of Fact and Conclusions of Law are submitted as Attachment 3.

Respectfully submitted,

Dated: August 7, 2020

By: /s/ Kelly Darr

Disability Rights Pennsylvania
Kelly Darr (PA ID 80909)
Robin Resnick (PA ID 46980)
Laura Caravello (PA ID 312091)
Disability Rights Pennsylvania
1800 J.F. Kennedy Blvd., Suite 900
Philadelphia, PA 19103-7421
215-238-8070
215-772-3126 (fax)
kdarr@disabilityrightspa.org
rresnick@disabilityrightspa.org
lcaravello@disabilityrightspa.org

By: /s/ Kobie Flowers

Brown Goldstein Levy LLP
Kobie Flowers (MD 0106200084)
Sharon Krevor-Weisbaum
(MD 8712010337)
James Strawbridge (MD 1612140265)
120 E. Baltimore St., Ste. 1700
Baltimore, MD 21202
410-962-1030
410-385-0869 (fax)
kflowers@browngold.com
skw@browngold.com
jstrawbridge@browngold.com

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Robin Resnick, hereby certify that Plaintiffs' Pretrial Memorandum was filed on August 7, 2020 with the Court's ECF system and are available for viewing and downloading from the ECF system by the following counsel who consented to electronic service:

Nicole J. Boland, Deputy Attorney General
Stephen Moniak, Senior Deputy Attorney General
Karen M. Romano, Chief Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

/s/ Robin Resnick
Robin Resnick