**ATTACHMENT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JOSEPH DRENTH and THE NATIONAL FEDERATION OF THE BLIND OF PENNSYLVANIA, | : : : : Civil No. 1:20-CV-00829 |
| Plaintiffs, | : : : Judge Jennifer P. Wilson |
| v. | : : |
| KATHY BOOCKVAR, in her official capacity as Secretary of the Commonwealth, and DEPARTMENT OF STATE OF THE COMMONWEALTH OF PENNSYLVANIA, | : : : : : |
| Defendants. | : : |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Pursuant to Local Rule 48.2, Plaintiffs, through their counsel, submit these

Proposed Findings of Fact and Conclusions of Law.

## I.   FINDINGS OF FACT

### A.   The Parties

1.    Plaintiff Joseph Drenth is a resident of Bucks County, Pennsylvania;

Stip. # 1; Defs.' Responses to Pls.' First Set of Requests for Admissions # 1 (P-

25).[1]

---

[1]  References to "P-__" are to the exhibits that Plaintiffs marked for intro-
duction at trial.  References to "Doc." are to the ECF filing numbers.

2.      Mr. Drenth is legally blind.  Stip. # 2; Defs.' Responses to Pls.' First Set of Requests for Admissions # 2 (P- 24); Drenth Decl. ¶ 4 (P-26); Complaint & Answer ¶¶ 18, 37 (P-61 & P-62).

3.      Mr. Drenth is registered to vote in Pennsylvania.  Stip. # 3; Defs.' Responses to Pls.' First Set of Requests for Admissions # 1 (P-25); Drenth Decl. ¶ 6 (P-26).

4.      Plaintiff National Federation of the Blind of Pennsylvania ("NFB-PA") is a non-profit corporation and an affiliate of the National Federation of the Blind ("NFB").  Stip. # 4; Heitz Decl. ¶¶ 6, 8 (P-27); Compl. & Answer ¶ 19 (P-64 & P-65).

5.      NFB-PA is a membership organization and some of its members are blind.  Stip. # 5; Defs.' Responses to Pls.' First Set of Requests for Admissions # 3 (P-25); Heitz Decl. ¶ 8 (P-27).

6.      NFB-PA promotes the civil rights of blind people and their full participation and integration in community life, including teaching blind people how to participate in civic activities such as voting.  Stip. # 6; Heitz Decl. ¶¶ 6, 7, 10, 11 (P-27).

7.      NFB-PA's blind members include individuals who are registered to vote in Pennsylvania.  Stip. # 7; Heitz Decl. ¶ 14 (P-27).

8.      Defendant Department of State ("DOS") is an agency of the Commonwealth of Pennsylvania.  Stip. # 8; 71 P.S. § 61(a).

9.      Defendant Kathy Boockvar is the Secretary of the Commonwealth. Stip. # 9; Compl & Answer. ¶ 21 (P-61 & P-62).

10.     DOS and Secretary Boockvar are responsible for administering Pennsylvania's election scheme.  *Baldwin v. Cortes*, 378 F. App'x 135, 138-39 (3d Cir. 2010).

11.     DOS and Secretary Boockvar oversee Pennsylvania's electoral process and are responsible for planning, developing, and coordinating the statewide implementation of Pennsylvania's Election Code.  *See* DOS, *Voting and Elections*, https://www.dos.pa.gov/VotingElections/Pages/default.aspx (P-28); DOS, Bureau of Elections and Notaries, https://www.dos.pa.gov/about-us/Pages/Director-Bureau-of-Elections-and-Notaries.aspx (P-29).

12.     While the County Boards of Elections ("CBEs") have some responsibilities for election administration, the responsibilities of DOS and Secretary Boockvar are significant, including: certifying electronic voting systems and providing some state and federal funding to CBEs for the purchase of such systems; certifying the federal and state candidates and statewide constitutional amendment and ballot questions to be included on the ballots; serving as the chief election official to implement the federal Help America Vote Act and the National

Voter Registration Act, including coordinating with and assisting counties to comply with their obligations under those statutes; providing a statewide method by which CBEs can electronically deliver ballots to uniformed and overseas voters under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"); and operating the online process to apply for absentee or mail-in ballots.  Marks Dep. at 29:23-52:15, 55:6-56:15 (P-1).[2]

13.     DOS receives federal financial assistance.  Stip. # 11; *See* Letter from K. Boockvar to M. Harrington dated Apr. 27, 2020 & Attachment (P-31); Letter from R. Torres to B. Newby dated July 10, 2018 & Attachment (P-32); *see also* Marks Dep. at 34:2-5 (P-1) (testifying that DOS provided CBEs with federal grant funds).

### B.     Defendants' Paper-Based Absentee and Mail-In Voting Program

14.     Pennsylvania has two options for registered voters who do not or cannot vote in person at their local polling places – mail-in ballots and absentee ballots.  Stip. # 12; 25 P.S. §§ 3146.1-3146.8, 3150.11-3150.17; *accord* Marks Dep. at 54:13-17 (P-1); Marks Decl. dated May 24, 2020 ¶¶ 5-7 (P-46); TRO/Injunction Tr. at 45:19-24 (P-16) (testimony of Jonathan Marks).

---

[2]  Jonathan Marks, DOS's Deputy Secretary of Elections and Commissions, was designated by Defendant DOS as its Rule 30(b)(6) witness.  Marks Dep. at 9:20-11:11, 12:15-18 (P-1).

15.     All registered Pennsylvania voters are eligible to vote by mail-in ballots without offering any justification or excuse, including those who also are eligible to vote by absentee ballot.  25 P.S. § 2602(z.6); Stip. # 14; Marks Dep. 53:11-17 (P-1); TRO/Injunction Tr. at 46:20 (P-16) (testimony of Jonathan Marks).

16.     Pennsylvania voters who seek to vote by mail-in or absentee ballot must apply either on paper or online through a portal operated by DOS, and CBEs process the applications to determine if the applicants are qualified to vote.  Stips. ## 16, 17; 25 P.S. §§ 3146.2-3146.2b, 3150.12; *see also* Defs.' Responses to Pls.' First Set of Requests for Admissions # 7 (P-25); Compl. & Answer ¶ 46 (P-64 & P-65); Marks Dep. at 54:19-57:2 (P-1); Marks Decl. dated May 24, 2020 ¶ 11 (P-46); TRO/Injunction Tr. at 46:3-11 (P-16) (testimony of Jonathan Marks).

17.     After the CBE determines that a voter who applied for a mail-in or absentee ballot is qualified to vote, it sends to the voter via mail a package that consists of: (a) a paper ballot; (b) a plain white envelope marked "Official Absentee Ballot," known as the secrecy envelope; and (c) a return envelope.  Stip. # 18; Marks Dep. at 57:3-14 (P-1); Marks Decl. dated May 24, 2020 ¶ 13 (P-46); TRO/Injunction Tr. at 46:10-16 (P-16) (testimony of Jonathan Marks).

18.     When a voter receives the absentee/mail-in ballot package, the voter must do the following in order for his or her vote to be counted: (a) cast his vote by marking the ballot; (b) place the marked ballot into the secrecy envelope and seal

5

it; (c) place the sealed secrecy envelope into the return envelope and seal it; (d) review the declaration on the return envelope; (e) sign the declaration on the return envelope; and (f) deliver the ballot within its two envelopes so that it is received by the voter's CBE by 8:00 p.m. on the date of the election.  25 P.S. §§ 3146.6, 3150.16; *see also* Marks Dep. at 57:15-58:3 (P-1); Marks Decl. dated May 24, 2020 ¶ 14 (P-46); TRO/Injunction Tr. at 46:10-17 (P-16) (testimony of Jonathan Marks).

19.   Only sighted Pennsylvania voters can review, mark, assemble, sign, and return their paper absentee and mail-in ballots privately and independently without relying on assistance from other persons or revealing their votes to other persons; blind Pennsylvania voters cannot do the same.  Compl. & Answer ¶¶ 53 (P-64 & P-65); Drenth Decl. ¶¶ 10-11 (P-25); Heitz Decl. ¶¶ 16-18 (P-27); Weber Decl. ¶ 28 (P-35); Senk Decl. ¶ 29 (P-36); Blake Decl. ¶¶ 9-13 (P-41); Gilbert Decl. ¶ 38 (P-40); Gilbert Rep. at 3 (P-7).

20.   DOS has acknowledged that its absentee and mail-in voting program is not accessible to blind voters and that, although "[a]ll voters must have the right to vote privately and independently," currently the only way for blind voters to do so is through accessible voting at a polling place:

> [U]nder federal law, voters with disabilities must be provided with accessible methods of voting for all elections.  All voters have the right to vote privately and independently.  Further voters who are visually impaired or who may have difficulty

> marking their ballot will need access to accessible voting
> systems, and cannot rely solely on vote by mail or absentee
> voting.

Email from W. Murren, DOS, dated Apr. 23, 2020 (P-37).

21.    DOS admits that Pennsylvania's absentee and mail-in ballot process is

not accessible to blind voters because each part of it – the ballot, the secrecy

envelope, the declaration, and the return envelope – consist of printed words on

paper that cannot be read and completed privately and independently by blind

voters.  Marks Dep. at 58:10-67:7, 72:19-73:6, 240:7-13 (P-1).

22.    Blind Pennsylvania voters must rely on sighted individuals to read

their paper absentee or mail-in ballots to them.  *See* Drenth Decl. ¶ 11 (P-25); *see*

*also* Marks Dep. 58:10-15, 62:13-15 (P-1); Heitz Decl. ¶ 18 (P-27).

23.    Blind Pennsylvania voters must tell sighted individuals the candidates

for whom they wish to vote and they must rely on sighted individuals to mark the

paper absentee or mail-in ballots so as to accurately reflect their choices.  *See*

Drenth Decl. ¶ 11 (P-26); Heitz Decl. ¶ 18 (P-27); *see also* Marks Dep. 65:8-14,

66:10-14 (P-1).

24.    Blind voters, like Mr. Drenth and NFB-PA members, do not want to

rely on sighted persons for assistance in casting their vote nor do blind voters want

to reveal to those sighted persons their private electoral choices.  *See* Drenth Decl.

¶ 12 (P-26); Heitz Decl. ¶ 19 (P-27); Weber Decl. ¶ 7 (P-35).

7

C.     **Defendants' Accessible Write-In Ballot Process**

25.     On May 27, 2020, the Court entered a preliminary injunction order requiring Defendants to allow blind voters to request and vote in the June 2, 2020 primary election using the Accessible Write-In Ballots ("AWIB") process.  Order ¶¶ 1, 3-9 (May 27, 2020) (Doc. 32).

26.     In accordance with the Court's preliminary injunction, blind voters could email DOS to request to vote by the AWIB process in the June 2020 primary election.  Order ¶ 4 (May 27, 2020) (Doc. 32); DOS, *Pennsylvania Offers Accessible Write-In Ballots for Voters with Disabilities for June 2 Primary* (May 28, 2020) (P-38).

27.     DOS did not offer or ask any blind voter to test the AWIB process before it was used in the June 2020 primary.  Marks Dep. at 169:17-20 (P-1).

28.     Twenty-six individuals, including Mr. Drenth, applied to vote using the AWIB process in the June 2, 2020 primary, but DOS sent AWIB packages to only sixteen of those applicants since nine had not previously applied for absentee and mail-in ballots by the statutory deadline and one was not a registered Pennsylvania voter.  Defs.' Responses to Pls.' First Set of Interrogatories # 9 (P-30); Drenth Decl. ¶ 18 (P-26).

29.     In response to requests to vote through the AWIB process, DOS electronically sent the following materials to voters: (a) a computer file containing

8

a list of candidates for whom the voters could vote (the "AWIB candidate list");

(b) a computer file with the ballot which listed the various offices and had fillable

fields next to those offices (the "AWIB ballot"); (c) a declaration form; (d) a PDF

file for the envelope to return the AWIB to the voter's CBE; and (e) instructions.

*See* Copy of Joseph Drenth's AWIB Materials (redacted) (P-39); Drenth Decl. ¶ 18

(P-26); *see also* Order ¶ 5 (May 27, 2020) (Doc. 32); TRO/Injunction Tr. at 56:8-

58:18 (P-16) (testimony of Jonathan Marks) (explaining that AWIB includes a

candidate list appropriate to the voter's precinct and a separate fillable form).

30.    To vote using the AWIB process, a blind voter either had to: (1) copy

the name of each candidate choice from the AWIB candidate list, switch to the

AWIB ballot, and paste the name onto the appropriate line on the AWIB ballot, or

(2) memorize the spelling of the name of each candidate choice from the AWIB

candidate list, switch to the AWIB ballot, and type the name into the appropriate

line on the AWIB ballot.  *See* Drenth Decl. ¶ 44 (P-26); Weber Decl. ¶ 16 (P-35);

Gilbert Decl. ¶ 19 (P-40); Gilbert Rep. at 3 (P-7).

31.    After completing the AWIB ballot, the blind voter was required to

print it out and return it to his or her CBE.  *See* Defs.' Responses to Pls.' First Set

of Requests for Admissions ## 19, 21 (P-25).

32.    The AWIB materials were not accessible to blind voters seeking to

vote privately and independently, and the AWIB process was particularly

9

burdensome and inaccessible for voters who were not technologically adept and/or do not have printers. *See* Gilbert Decl. ¶¶ 13-29 (P-40); Gilbert Rep. at 3-4 (P-7); Drenth Decl. ¶¶ 20-22, 31, 46, 55, 66 (P-26); Heitz Decl. ¶¶ 20-22 (P-27); Senk Decl. ¶¶ 10-25, 30 (P-36); Weber Decl. ¶ 28 (P-35).

33.    The AWIB process results in cognitive overload for blind voters because it is extremely challenging to repeatedly switch between the candidate list (where voters must memorize the spelling of their candidates' names or copy those names) and the ballot (where voters must correctly type in their candidates' names or paste those names). *See* Gilbert Decl. ¶¶ 19-22 (P-40); Gilbert Rep. at 4 (P-7); *see also* TRO/Injunction Tr. at 25:20-26:13, 31:21-33:22, 42:15-43:3, 75:9-19 (P-16) (testimony of Jonathan Lazar, Ph.D., an accessibility expert, that the AWIB process presented a cognitive load issue due to requirement that blind voters copy and paste or correctly spell the names of candidates); TRO/Injunction Tr. at 12:16-18, 14:24-15:2, 15:21-16:13 (P-16) (testimony of Lynn Heitz concerning challenges presented when blind voters must copy and paste from one document to another); Drenth Decl. ¶¶ 44, 46 (P-26) (describing difficulties with AWIB navigation); Weber Decl. ¶¶ 3, 13-19 (P-35) (noting that she could not readily navigate the AWIB using her built-in screen reader in her Mac (Apple) computer).

34.    There were also a significant number of formatting and similar issues in the AWIB candidate lists and ballots that made the process burdensome to use.

10

*See* Drenth Decl. ¶¶ 33-42, 45, 47-50 (P-26); Weber Decl. ¶¶ 21-22 (P-35); Gilbert Decl. ¶¶ 24-25 (P-40); Gilbert Rep. at 4 (P-7).

35.     The AWIB also proved problematic because voters were required to print envelopes, and even voters who had printers had trouble printing the envelope due to the lack of instructions.  Drenth Decl. ¶¶  53-54 (P-26); Weber Decl. ¶¶ 23-25 (P-35); Gilbert Decl. ¶¶ 26-29 (P-40); Gilbert Rep. at 4-5 (P-7).

36.     It took one blind voter – who is an IT specialist – and his non-blind wife five times to line up a preloaded paper envelope in the printer before it printed correctly and, even then, the images were distorted.  Senk Decl. ¶¶ 16-27 & Attachments (P-36).

37.     Given their experiences with the AWIB process during the June 2020 primary, Mr. Drenth and at least some other blind voters would not want to use it again.  *See* Drenth Decl. ¶ 66 (P-26); Heitz Decl. ¶¶ 21 (P-27); Senk Decl. ¶¶ 30-32 (P-36).

**D.     Need for and Feasibility of an Accessible Ballot Marking and Delivery Tool and Defendants' Purported Intent to Secure Such a Tool**

38.     Accessible ballot marking and delivery tools are tools that electronically deliver ballots to blind voters and enable them to mark the ballots electroni-

cally using screen reader technology.  Stip. # 19; Marks Dep. at 102:15-104:3 (P-1); Gilbert Decl. ¶ 33 (P-40); Gilbert Rep. at 5 (P-7); Blake Decl. ¶¶ 15-16 (P-41).[3]

39.     Many blind individuals, including Mr. Drenth and some NFB-PA members, use screen reader technology, which transmits properly formatted textual information on a computer screen to an audio output or a refreshable Braille display pad, to read, navigate and complete forms independently and privately on their computers, tablets, and smartphones.  *See*  Stip. # 20; Blake Decl. ¶¶ 6-7 (P-41); Drenth Decl. ¶ 7 (P-26); Heitz Decl. ¶ 5 (P-27).

40.     Since 2019, Plaintiffs and their advocates have asked Defendants to implement an accessible ballot marking and delivery tool.  Letter from M. Riccobono to K. Boockvar dated Sept. 27, 2019 (P-16); Letter from K. Darr to T. Gates dated Feb. 19, 2020 (P-20); Letter from S. Krevor-Weisbaum to K. Boockvar dated May 13, 2020 (P-19).

41.     The Pennsylvania Council for the Blind, too, advocated that DOS implement accessible ballot marking and delivery system and noted on April 21, 2020 that the problem persisted despite DOS's assurances that it was working on it

---

[3]  As used in the Findings of Fact and Conclusions of Law, an "accessible ballot marking and delivery tool" refers to technology that electronically delivers ballots to blind voters that integrate into a single document both the candidates' names and a means to make the selection (using, for instance, a check mark) so as to permit blind voters to privately and independently read the ballot using their screen reader software and mark the ballot.  It does not refer to the AWIB process.

and advised DOS that "[t]his is far too important an issue to say that we will solve it later." Email from C. Hunsinger to M. Moser, *et al.* dated Apr. 21, 2020 (P-42).

42.     Accessible ballot delivery and marking tools exist and are commercially available from private vendors and through open-source platforms. Stip. # 21; Marks Dep. at 103:4-10 (P-1); *see also* Blake Decl. ¶¶ 17-19 (P-41); Gilbert Decl. ¶¶ 34, 36 (P-40); Gilbert Rep. at 6 (P-7).

43.     Other U.S. states and municipalities use accessible ballot delivery and marking tools to allow blind voters to receive accessible ballots electronically and to read and mark those ballots, privately and independently. *See* Marks Dep. at 107:16-22, 122:20-24 (P-1); Blake Decl. ¶¶ 20-24 (P-41); Gilbert Decl. ¶ 32 (P-40); Gilbert Rep. at 6 (P-7).

44.     An accessible ballot delivery and marking tool is more accessible to blind voters than Pennsylvania's paper-based absentee and mail-in voting program which does not allow blind voters to vote privately and independently. *See* Gilbert Decl. ¶¶ 20-31, 35-36 (P-40); Gilbert Rep. at 3, 5 (P-7); Marks Dep. at 104:20-106:11, 124:4-9, 216:4-217:3 (P-1); Blake Decl. ¶ 16 (P-41).

45.     Unlike the AWIB process that requires blind voters to transfer candidates' names from a candidate list to a separate ballot, accessible ballot delivery and marking tools integrate into a single document the candidate list and the means

for the voter to designate their choices.  Gilbert Decl. ¶¶ 34-35 (P-40); Gilbert Rep.

at 5-6 (P-7); Blake Decl. ¶ 15 (P-41).

46.     Unlike the AWIB process, an accessible ballot delivery and marking

tool is accessible to blind voters because it does not result in cognitive overload for

such voters.  Gilbert Decl. ¶ 36 (P-40); Gilbert Rep. at 6 (P-7).

47.     Pennsylvania currently electronically delivers ballots via email to

thousands of voters qualified to vote under UOCAVA or its state counterpart, the

Uniformed Military and Overseas Voting Act ("UMOVA"), who request electronic

delivery.  Stip. # 22; Compl. & Answer ¶ 62 (P-64 & P-65); Defs.' Responses to

Pls.' First Set of Interrogatories ## 4, 5 (P-30); Marks Dep. at 47:16-48:12, 109:22-

110:3, 111:9-12 (P-1).

48.     DOS asserts that it does not intend to use the AWIB process in the

November 2020 election.  Stip. # 25; Marks Dep. at 170:10-13 (P-1); Email from

Jonathan Marks, DOS, to Timothy McCarthy dated June 11, 2020 (P-43)*; Defs.'

Responses to Pls.' First Set of Requests for Admissions # 26 (P-25).

49.     In April 2020, the U.S. Election Assistance Commission awarded

DOS more than $14.2 million, which DOS stated would be used, *inter alia*, to

"implement an accessible electronic ballot marking device and tool to enable

voters with disabilities to vote absentee or by mail."  Letter from K. Boockvar to

M. Harrington dated Apr. 10, 2020 (P-22); *accord* Email from W. Murren, DOS,

dated May 8, 2020 (P-45); Marks Dep. at 117:21-118:2, 177:3-20 (P-1).

50.    While DOS claims to have set aside $1.5 million of the 2020 federal

funding for the electronic ballot marking and delivery tool, it has not yet spent any

of that funding.  Stip. # 35; Marks Dep. at 177:21-178:22, 186:21-187:1 (P-1).

51.    DOS has concluded that it can implement mitigation measures to

address any possible security risks related to use of an accessible ballot marking

and delivery tool.  *See* Marks Dep. at 140:11-142:1 (P-1).

52.    Defendants state that DOS intends to have an accessible ballot

marking and delivery tool in place and operational for the November 2020 general

election, but there is no signed contract yet and the procurement process (which

purportedly began five months ago and ultimately requires approval by the

Attorney General) is ongoing.  Stips. ## 32, 33; Marks Dep. at 106:12-18, 107:6-9,

112:8-113:22, 122:17-19, 170:14-17 (P-1); Defs.' Responses to Pls.' First Set of

Interrogatories # 15 (P-30).

53.    Defendants have refused to identify the vendor from which they

purportedly are securing an accessible ballot delivery and marking tool, Marks

Dep. at 130:15-131:3 (P-1), and since there are different types of such tools, *see*

Gilbert Decl. ¶ 36 (P-40); Gilbert Rep. at 6 (P-7); Blake Decl. ¶¶ 17-19 (P-41), it is

unknown whether the tool will meet blind voters' accessibility needs.

54.     Defendants have not identified how the tool will be implemented, which may impact its effectiveness in providing equal and meaningful access to blind voters if, for instance, the CBEs, rather than DOS, will be responsible for accepting applications from blind voters who want to use the tool and providing blind voters with access to the tool since Defendants have asserted that they have limited control over the CBEs.  *See* Marks Dep. at 224:3-20 (P-1).

55.     Defendants have not identified how they will "secure" the tool or whether further contracts and/or payments will be needed after November 2020, which is necessary information to assess whether it will be in place for only one or two elections or whether it will ensure more permanent relief for blind voters.

56.     It is unclear whether or even if Defendants will subject this new tool to testing, including with respect to accessibility and usability issues, prior to implementation to ensure its effectiveness for blind voters.

### E.     Need for and Feasibility of Modifications to the Ballot Return and Declaration Processes and Defendants' Purported Intent to Make Some Minor Modifications

57.     Implementation of an accessible ballot marking and delivery tool will not make Defendants' absentee and mail-in voting program accessible without further modifications to how blind voters can return their marked ballots because it does not address barriers such voters face due to: (a) inability to privately and independently print the ballots after they are marked; (b) independently identifying

16

and using the secrecy and return envelopes; and (c) independently reading and signing the declaration included on the return envelope in the appropriate place to ensure the votes are counted. *See* Supp. Heitz Decl. ¶¶ 10-15 (P-51); Supp. Senk Decl. ¶¶ 7-14 (P-52); Supp. Weber Decl. ¶¶ 10, 23-24 (P-53); Salisbury Decl. ¶¶ 9-10, 13-15, 18-20 (P-54).

58.     Many blind people do not have printers because they do not, or rarely, read printed text. *See* Drenth Decl. ¶¶ 31, 51 (P-26); Heitz Decl. ¶ 22 (P-27); Supp. Heitz Decl. ¶ 7 (P-51); Supp. Weber Decl. ¶¶ 12-15 (P-53); Salisbury Decl. ¶¶ 11-16 (P-54).

59.     To print ballots marked using an accessible ballot delivery and marking tool, blind voters without printers would need to deliver an electronic copy of their marked ballot (if this were possible) to a third-party or a public place for printing, which would cause their electoral choices to be revealed and eviscerate the privacy of their vote. Supp. Weber Decl. ¶¶ 12-22 (P-53); Salisbury Decl. ¶¶ 12-16 (P-54).

60.     Blind Pennsylvania voters must rely on sighted individuals to put the marked absentee or mail-in ballots into the secrecy envelope, seal it, and put the secrecy envelope into the return envelope. *See* Marks Dep. 58:16-61:4, 62:7-12, 66:15-67:7 (P-1).

17

61.     Some blind voters would struggle to use the secrecy and return envelopes without assistance from a sighted person and might not even be able to identify the package containing the secrecy and return envelopes that the CBE sends in the mail.  *See* Supp. Heitz Decl. ¶¶ 16-17(P-51); Supp. Senk Decl. ¶¶ 12 (P-52); Supp. Weber Decl. ¶¶ 23-24 (P-53); Supp. Drenth Decl. ¶¶ 11-13 (P-55); Marks Dep. at 58:16-61:4, 62:7-2, 66:5-67:7 (P-1).

62.     Blind Pennsylvania voters must rely on sighted individuals to read the declaration on the return envelope to them and help them locate the appropriate place to sign that declaration.  *See* Marks Dep. 61:5-62:6, 63:4-65:7 (P-1).

63.     In trying to sign the declaration on the return envelope, blind voters also might inadvertently sign over the "To" or "Return" address, rendering the return envelope undeliverable.  Supp. Heitz Decl. ¶ 22 (P-51); Supp. Drenth Decl. ¶ 19 (P-55).

64.     A mail-in or absentee ballot will not be counted if the voter fails to sign on the side of the envelope with the declaration.  Marks Dep. at 67:10-69:20 (P-1).

65.     DOS has never instructed the CBEs to count absentee and mail-in ballots that were signed on the wrong side.  Marks Dep. 72:14-18 (P-1).

66.     Although some blind voters, like Mr. Drenth, have more advanced technological tools that enable them to read some printed material, those tools have

18

limits. *See* Drenth Dep. at 11:7-12:16, 15:13-17 (P-2) (testifying that the smart-phone app he uses does not provide a verbatim translation of the material); Supp. Drenth Decl. ¶¶ 12-13 (P-55) (confirming smartphone app has trouble reading some fonts and writing).

67.    Not all blind voters have smartphones, scanners, or other tools that would enable them to read printed material like envelopes or declarations.  Supp. Heitz Decl. ¶ 9 (P-51); Supp. Senk Decl. ¶ 14 (P-52).

68.    Electronic return (*e.g.,* using email or an online portal) of ballots marked by blind voters using an accessible ballot marking and delivery tool would allow blind voters – especially those without printers or who must rely on sighted people to print – to use the absentee or mail-in voting program privately and independently.  *See* Supp. Heitz Decl. ¶¶ 11-27 (P-51); Supp. Senk Decl. ¶¶  8-9 (P-52); Supp. Weber Decl. ¶¶ 10-22 (P-53); Salisbury Decl. ¶¶ 9-16 (P-54).

69.    While a government report identified some security risks associated with electronic return of ballots, it acknowledges that "[s]ome voters, due to specific needs or remote locations, may not be able to print, sign, and mail in a ballot without significant difficulty" and also identifies strategies that can be employed to mitigate risks associated with electronic return of ballots  Cyber-security and Infrastructure Security Agency, *et al.*, *Risk Management for Electronic Ballot Delivery, Marking, and Return* at 3-6 (Doc. 51-4).

19

70.     Plaintiffs' experts also have identified strategies and techniques that Pennsylvania can implement to make the electronic submission of ballots by blind voters more secure, including by using encryption and multifactor authentication. Pelletier Rep. at 1-4 (P-9); Selker Rep. at 2-4 (P-11).

71.     Several states – including Delaware and West Virginia – authorize blind voters to return ballots by email or via online portals.  Blake Decl. ¶¶ 25-28 (P-41).

72.     More than 25 states authorize voters eligible under the Uniformed and Overseas Citizens Access to Voting Act ("UOCAVA") to submit their marked ballots by email, fax, and/or through an online portal rather than only by mail. Blake Decl. ¶ 29 (P-41); Pughsley Decl. ¶¶ 5-7 (P-57) (summarizing UOCAVA information for U.S. states available at https://www.fvap.gov); Doyle Decl. & Attachments (P-63) (similar).

73.     While electronic return would fully resolve all accessibility issues for blind voters, at minimum Pennsylvania can and must make reasonable modifications to their mail and declaration processes to make them more accessible to those voters, including: (a) significantly modifying the sizes of the secrecy and return envelopes to allow blind voters to more readily identify them; (b) placing hole punches on both sides of the signature line for the declaration printed on the return envelope to help guide blind voters as to where they should sign and requiring

20

CBEs to count ballots of blind voters regardless of where they sign on the return envelope; (c) providing instructions electronically to voters that can be accessed before and after they receive the secrecy and return envelopes to inform them how to assemble and return their ballots; (d) electronically providing the text of the declaration so blind voters know what they are affirming when they sign the return envelope; (5) creating a hotline for blind voters to contact for help with accessibility and usability issues; and (e) requiring that DOS, rather than the CBEs, deliver the envelopes to blind voters or, alternatively, ensuring that DOS develops and implements sanctions for CBEs that fail to comply.  *See* Supp. Drenth Decl. ¶¶ 15-16, 18-24 (P-55); Supp. Heitz Decl. ¶¶ 18-20, 24-26, 28 (P-51); Supp. Senk Decl. ¶ 15 (P-52); Supp. Weber Decl. ¶ 24 (P-53); Salisbury Decl. ¶¶ 22-23 (P-54); Supp. Gilbert Decl. ¶¶ 6-15 (P-50).

### F.  **Harm to Plaintiffs Absent Permanent Injunctive Relief**

74.  Voting remotely by mail-in or absentee ballot enables voters to exercise their franchise without physically travelling to and being present at their polling places and voting in person.  Stip. # 38; Defs.' Responses to Pls.' First Set of Requests for Admissions # 32 (P-25).

75.  Mr. Drenth and other blind voters want the opportunity to have equal and meaningful access to Pennsylvania's voting programs so they can participate in the democratic process by voting, including voting in the November 2020

election and other future elections using the absentee and mail-in voting program

so they do not have to vote in person.  *See* Stips. ## 36, 37; Drenth Decl. ¶¶ 62-65

(P-26); Heitz Decl. ¶ 23 (P-27); Senk Decl. ¶¶ 27-28 (P-36); Weber Decl. ¶ 26, 28

(P-35).

76.     Mr. Drenth and other blind voters want and need a truly accessible

ballot delivery and marking system along with changes to the return process –

including electronic return – so that, as sighted voters do, they can vote privately

and independently without travelling to a polling place.  *See* Drenth Decl. ¶¶ 11-

12, 64, 67 (P-26); Heitz Decl. ¶¶ 25-26 (P-27); *see also* Weber Decl. ¶ 20 (P-35);

Senk Decl.¶ 32 (P-36); Supp. Drenth Decl. ¶¶ 7-24 (P-55); Supp. Heitz Decl. ¶¶

10-28 (P-51); Supp. Senk Decl. ¶¶ 8-15 (P-52); Supp. Weber Decl. ¶¶ 10-24 (P-

53); Salisbury Decl. ¶¶ 9-23 (P-54).

77.     Voting by absentee and mail-in ballot is particularly important now

because in-person voting places voters at risk of infection of COVID-19 since the

pandemic shows no sign of abating.  *See* Stips. ## 39, 40; Centers for Disease

Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the

U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

(last checked Aug. 5, 2020) (as of August 4, 2020, Pennsylvania had nearly

110,000 confirmed COVID-19 cases and more than 7,200 deaths).

78.     Some blind people, including Mr. Drenth, have co-occurring conditions that can place them at higher risk of COVID-19 infection or more serious consequences from COVID-19 infection.  Stip. # 46; Drenth Decl. ¶ 15 (P-26).

79.     The Centers for Disease Control and Prevention have recommended that voters consider other "available alternatives" to voting in person as a means to protect against COVID-19 infection.  Stip. # 42; Centers for Disease Control and Prevention, *Considerations for Election Polling Locations and Voters*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last checked August 5, 2020).

80.     To alleviate crowded polling places and the risk of COVID-19 infection, DOS encouraged Pennsylvania voters who were concerned about in-person voting to vote by mail-in or absentee ballot during the June 2020 primary, and it expects to do the same for the November 2020 general election.  Stips. ## 41, 43; Marks Dep. at 96:21-97:13 (P-1).

81.     DOS encouraged voting by mail-in ballot, even though it acknowledged that its absentee and mail-in voting program does not allow blind voters to vote privately and independently.  *See* Email from W. Murren, DOS, dated Apr. 23, 2020 (P-37).

82.     In the June 2, 2020 primary, more Pennsylvanians voted by absentee and mail-in ballots (1,459,509) than voted in person at their polling places

(1,415,769).  Stip. # 44; Defs.' Responses to Pls.' First Set of Interrogatories # 1 (P-30).

83.     Particularly due to the threat of COVID-19 posed by in-person voting, blind voters want to vote privately and independently rather than voting in person at their polling places in the November 2020 election.  Stip. # 47; Heitz Decl.¶¶ 27-28 P-27); Drenth Decl. ¶ 68 (P-26).

84.     Blind voters do not want to be forced to choose between risking their health by voting in person in the November 2020 election and giving up their right to vote privately and independently.  Heitz Decl. ¶ 28 (P-27).

## II.     CONCLUSIONS OF LAW

### A.     Standard for ADA and RA Liability

1.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

2.     Section 504 of the RA similarly prohibits disability discrimination by any program that receives federal financial assistance.  29 U.S.C. § 794(a).

3.     Liability under Title II of the ADA and Section 504 of the RA is governed by the same substantive standard.  *Berardelli v. Allied Services Inst. of*

*Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018); *Drenth v. Boockvar*, No. 1:20-cv-00829, 2020 WL 2745729, at *5 (M.D. Pa. May 27, 2020).

4.    To prevail on a claim under either Title II of the ADA or Section 504 of the RA, a plaintiff must establish that he: (1) has a disability; (2) is otherwise qualified to participate in the covered entity's services, programs, or activities; and (3) was excluded from participation in or denied the benefits of those services, programs, or activities or otherwise subject to discrimination by that entity. *Haberle v. Troxel*, 885 F.3d 170, 178 (3d Cir. 2018); *Drenth,* 2020 WL 2745729, at *5.

**B.    Plaintiffs Are Protected and Defendants Are Covered by the ADA and RA**

5.    Plaintiff Drenth and blind members of Plaintiff NFB-PA are individuals with disabilities pursuant to Title II of the ADA and Section 504 of the RA. *See* 42 U.S.C. §§ 12102(1)(A), 12102(2)(A); 28 C.F.R. § 35.108(d)(2)(iii)(B); 29 U.S.C. § 705(20).

6.    Mr. Drenth and NFB-PA members who are registered to vote in Pennsylvania are "qualified" because they meet the essential eligibility requirements to participate in Pennsylvania's voting programs.  *See* 42 U.S.C. § 12131(2).

7.    Plaintiffs are thus qualified individuals with disabilities who are protected under Title II of the ADA and Section 504 of the RA.  *Drenth*, 2020 WL 2745729, at *5.

8.    Defendant DOS, administered by Defendant Boockvar, is a department of the Commonwealth, 71 P.S. § 61(a)), and thus a "public entity" subject to Title II of the ADA.  42 U.S.C. § 12131(1)(B).

9.    Defendant DOS, as a recipient of federal financial assistance, is required to comply with Section 504 of the RA.  29 U.S.C. § 794(a).

### C.    Defendants' Absentee and Mail-In Voting Program Violates the ADA and RA

#### 1.    Congress Intended the ADA and RA to Remedy a Broad Range of Discriminatory Actions

10.    The Rehabilitation Act of 1973 "'was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities.'" *Berardelli*, 900 F.3d at 114 (citation omitted).  Yet, "[a]fter nearly two decades experience with the statute Congress acknowledged that the RA had 'shortcomings and deficiencies' … that were impeding its effectiveness in eliminating disability discrimination." *Id.* at 115 (citation omitted; ellipses added).

11.    In 1990, Congress enacted the ADA "'as a clear and comprehensive national mandate designed to eliminate discrimination against individuals with physical and mental disabilities ….'" *Berardelli*, 900 F.3d at 115 (citations omitted).  The ADA fits "hand in glove with the RA," but extends its reach beyond only federally funded programs to include, *inter alia,* all state and local govern-

ments and their programs.  *Id.*; *see also* 42 U.S.C. § 12201(a) (the protections of the RA are a floor for those established by the ADA).

12.    In both the ADA and RA, Congress found that "discrimination against individuals with disabilities persists in such crucial areas as … voting …."  42 U.S.C. § 12101(3); 29 U.S.C. § 701(a)(5).

13.    Congress further understood that disability discrimination does not encompass merely intentional discrimination motivated by animus, but also includes "the discriminatory effects of … communication barriers, … failure to make modifications to … practices, and … relegation to lesser services, programs, activities …."  42 U.S.C. § 12101(5).

14.    Construing the ADA and RA, courts have held that covered entities must provide "meaningful access" to their programs and services.  *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003).  This encompasses not only elimination of discriminatory policies, practices, and procedures, but also the affirmative obligation to make reasonable modifications in programs and services unless doing so would result in a fundamental alteration.  *Alexander*, 469 U.S. at 300-01 & n.20; *Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487, 492-93 (3d Cir. 2004).

15.    In Title II of the ADA, Congress directed the United States Department of Justice ("DOJ") to promulgate regulations to implement Title II of the

ADA, 42 U.S.C. § 12134(a).  Because Congress directed DOJ to ensure that the

Title II regulations were consistent with specific RA regulations, 42 U.S.C. §

12134(b), the Third Circuit held that the Title II regulations have "the force of

law."  *Helen L. v. DiDario,* 46 F.3d 325, 332 (3d Cir. 1995).

16.    The Title II ADA regulations, like the RA regulations on which they

are modeled, make clear that that those statutes cover a broad range of discrimina-

tory activities.  *See* 28 C.F.R. Pts. 35, 41.

### 2.    Defendants Violate the ADA and RA by Denying Plaintiffs Equal and Meaningful Access to the Absentee and Mail-In Voting Program

17.    To ensure that individuals with disabilities have equal and meaningful

access to covered entities' programs, services, and activities, the ADA and RA

specifically prohibit such entities from: (1) affording people with disabilities an

opportunity to participate in or benefit from services that is not equal to that

afforded to others, and (2) providing people with disabilities with services that are

not as effective in affording equal opportunity to obtain the same result as that

provided to others.  28 C.F.R. §§ 35.130(b)(1)(ii)-(iii), 41.51(b)(1)(ii)-(iii).

18.    It cannot be seriously disputed that Pennsylvania's paper-based

absentee and mail-in voting program does not allow blind voters to vote privately

and independently, as sighted voters can.[4]  Completion of paper ballots requires

voters with visual disabilities to have assistance – they must ask sighted indivi-

duals to read the ballot to them, to mark the ballot for them, to assemble the ballot

for delivery, and to read the declaration to them and help them sign it.  In doing so,

they must reveal their electoral choices to the sighted individuals who are helping

them.  Thus, unlike sighted voters, blind voters are denied the opportunity to cast

their votes privately and to vote independently.  In affording sighted voters the

opportunity to vote privately and independently without voting in-person and not

affording that same service to blind voters, Defendants do not afford blind voters

the opportunity to participate equally and meaningfully in its programs or services

in violation of the ADA and RA.[5]

---

[4]  The "program, service, or activity" at issue in this case is Defendants' absentee and mail-in voting program which allows sighted – but not blind – voters the opportunity to vote privately and independently without voting in person.  *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503-04 (4th Cir. 2016) (in case presenting the identical issue, the court held the relevant program, service, or activity to be the state's absentee voting program, which was available to all voters, rather than all of the state's voting services).

[5]  It is not necessary for Plaintiffs to show that they were disenfranchised entirely or otherwise completely prevented from participating in Defendants' voting programs, services, and activities. It is sufficient to show that they were denied meaningful access, which includes the opportunity to vote privately and independently.  *See Disabled in Action v. Bd. of Elec.*, 752 F.3d 189, 198-99 (2d Cir. 2014).

19.     In *Nat'l Fed'n of the Blind v. Lamone*, the Fourth Circuit held that

Maryland officials violated Title II of the ADA and Section 504 of the RA by

relying exclusively on paper ballots in its absentee ballot process (available to all

registered voters).  Affirming the district court's finding that blind voters cannot

mark their paper ballots without assistance, unlike non-blind voters, the court

determined that "[t]his sharp disparity makes obvious that defendants have

provided 'an aid, benefit, or service [to disabled individuals] that is not as effective

in affording equal opportunity to obtain the same result, to gain the same benefit,

or to reach the same level of achievement as that provided to others.'"  813 F.3d at

506 (citation omitted).  The court explained:

> Voting is a quintessential public activity.  In enacting the
> ADA, Congress explicitly found that "'individuals with
> disabilities … have been … relegated to a position of
> political powerlessness in our society, based on charac-
> teristics that are beyond the control of such individuals.'"
> *Tennessee v. Lane*, 541 U.S. 509, 516, 124 S.Ct. 1978, 158
> L.Ed.2d 820 (2004) (quoting 42 U.S.C. § 12101(a)(7)).
> Ensuring that disabled individuals are afforded an
> opportunity to participate in voting that is equal to that
> afforded others, 28 C.F.R. § 35.130, helps ensure that those
> individuals are never relegated to a position of political
> powerlessness.  *We affirm the district court's conclusion that*
> *by effectively requiring disabled individuals to rely on the*
> *assistance of others to vote absentee, defendants have not*
> *provided plaintiffs with meaningful access to Maryland's*
> *absentee voting program.*

*Id.* at 507 (emphasis added).

20.    In holding that Plaintiffs were likely to succeed on the merits of their

ADA and RA claims, this Court wrote:

> Plaintiffs have … been denied the benefits of a public program
> – in this case the ability to vote privately and independently
> without being physically present at a polling location –
> because of their disability.  Because Plaintiffs are blind, they
> are unable to complete a paper mail-in ballot or absentee
> ballot privately and independently.

*Drenth*, 2020 WL 2745729, at *5.  This same analysis applies here.

21.    Nor can Defendants rely on the Accessible Write-In Ballot ("AWIB")

process used in the primary election to demonstrate that Plaintiffs have an equal

and meaningful opportunity to vote.  This Court determined that the AWIB process

was not "entirely adequate to achieve compliance with the ADA and RA[.]"

*Drenth*, 2020 WL 2745729, at *6.  Defendants themselves have repudiated the

AWIB process, explicitly stating that they have no current intention of using it in

any future elections.  Moreover, the AWIB process proved to be inaccessible to

blind voters who struggled with every step of the process – from completing the

declaration to printing the envelope – and, most significantly could not easily

complete the ballot because they had to switch back and forth from the candidate

list to type in their candidates' names or copy and paste them, resulting in

cognitive overload.

**3.     Defendants' Failure to Implement an Accessible Ballot Marking and Delivery Tool Violates the ADA's and RA's Reasonable Modification and <u>Effective Communications Mandates</u>**

22.     To ensure meaningful access to covered entities' programs, services, and activities, the ADA and RA require that they make "reasonable modifications" in their policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.  *See* 28 C.F.R. § 35.130(b)(7)(a); *Alexander*, 485 U.S. at 300-01 & n.20; *Disabled in Action*, 752 F.3d at 197.

23.     To prevail on a reasonable modification claim, a plaintiff need only put forward a proposed reasonable modification; the burden then shifts to the defendant to show that providing the modification would impose a fundamental alteration.  *See Frederick L.*, 364 F.3d at 492 n.4; *Lamone*, 813 F.3d at 507; *Disabled in Action*, 752 F.3d at 202.

24.     Plaintiffs have articulated a reasonable modification to ensure that blind voters have equal and meaningful access to receive and mark absentee and mail-in ballots, *i.e.*, implementation of an accessible ballot marking and delivery tool.  This tool would enable blind voters to read and mark their ballots privately and independently, just as sighted voters do.

25.     It is feasible for Defendants to implement an accessible ballot marking and delivery tool in Pennsylvania.  These tools are available commercially and through open-source platforms and are used in multiple state and local jurisdic-

32

tions.  DOS also has funding to implement an accessible ballot marking and delivery tool and agrees that such tools do not raise significant security concerns. Indeed, Defendants do not assert that it would be a fundamental alteration to implement such a tool.

26.     This Court should reach the same conclusion as the Fourth Circuit and hold that implementation of an accessible ballot marking tool is a reasonable modification for a state to accommodate blind voters and doing so would not result in a fundamental alteration.  *Lamone*, 813 F.3d at 507-08.  As the court explained: "[O]ur conclusions [that the state must provide a ballot marking tool as a reasonable modification] simply flow from the basic promise of equality in public services that animates the ADA."  *Id.* at 510.

27.     Defendants failure to implement an accessible ballot marking and delivery tool for blind voters also violates the ADA's mandate that public entities "take appropriate steps to ensure that communications with" participants with disabilities "are as effective as communications with others."  28 C.F.R. § 35.160(a)(1).  This mandate may require public entities to furnish "appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in and enjoy the benefits of" the entities' services, programs, or activities.  28 C.F.R. § 35.160(b)(1).  The public entity must give primary consideration to the individual's request when determining the type

of auxiliary aid or service to use.  28 C.F.R. § 35.160(b)(2).  Moreover, auxiliary aids and services must be provided "in such a way as to *protect the privacy and independence* of the individual with a disability."  *Id.* (emphasis added).

28.     Congress recognized that the ADA would require covered entities to implement technological advances to maximize the independence of people with disabilities and their inclusion in society.  *California Council of the Blind v. County of Alameda*, 985 F. Supp. 2d 1229, 1240 (N.D. Cal. 2013) (quoting H.R. Rep. 101-485(II), at 108 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 391).

29.     Here, Defendants' paper-based absentee and mail-in voting program does not provide effective communication for blind voters since they cannot privately and independently use that system to vote.  An accessible ballot marking and delivery tool is an auxiliary aid that blind voters want and that would protect their privacy and independence in the vitally important act of voting.  Defendants' failure to implement such a tool thus violates the ADA's effective communication mandate, too.

### 4.     Defendants' Failure to Modify Its Return and Declaration Processes for Blind Absentee and Mail-In Voters, Including Allowing Electronic Submission of Ballots, Violates the ADA's and RA's Reasonable Modification Mandates

30.     In Pennsylvania, the entire paper-based absentee and mail-in ballot voting program is inaccessible to blind voters—including how blind voters return

34

their marked ballots.  Defendants do not really dispute that the paper-based absentee and mail-in voting program—including the requirement that the ballot be placed in multiple envelopes and that the declaration on the return envelope be signed by hand—is inaccessible to blind voters and thus violates the ADA and RA.

31.     Defendants' proposed implementation of an accessible ballot delivery and marking tool will not remedy the inaccessibility of the return process so as to ensure that their absentee and mail-in voting program is accessible to blind voters. Barriers due to inability to print out the marked ballots privately, inability to independently place their ballots in the multiple envelopes, and inability to read and sign the declaration independently necessitate the need for further modifications.  *See* FOF ## 21, 57-73.  Defendants, by contrast, seemingly argue that the ADA and RA do not require them to ensure the process of returning a marked ballot is accessible – even though failure to do so denies blind voters equal and meaningful access to the absentee and mail-in voting program.

### a.      Modification to the Envelope and Declaration Processes Are Reasonable.

32.     Plaintiffs have proposed a number of reasonable modifications to the return and declaration processes used in the absentee and mail-in ballot program, including, *inter alia,* modifying the sizes of the envelopes; using hole punches to guide voters in signing the declaration; electronically sending mailing instructions and the text of the declaration; imposing sanctions on CBEs if they do not comply

35

(unless DOS is responsible for sending the envelopes and other materials). *See* FOF # 73.

33.     Defendants do not contend that these modifications would be fundamental alterations. Instead, they contend that they "have resolved" to "issue directives" that will "request" the CBEs (1) send secrecy and return envelopes to blind voters using the accessible ballot marking and delivery tool to ensure that the return envelope is "larger" than the secrecy envelope; and (2) accept the return envelope of a blind voter who voted using the accessible ballot marking and delivery system as long as a signature appears anywhere on the envelope (rather than on the signature line for the declaration that will be printed on the exterior of the return envelope). Stips. ## 50, 51; Marks Decl. dated July 21, 2020 ¶¶ 20-21 (P-48).

34.     These modifications are inadequate to address the inaccessibility of the return and declaration processes of the absentee and mail-in voting program. First, Defendants have yet to issue any directives. Second, "requesting" that the CBEs take action offers no concrete changes; indeed, Defendants concede that their enforcement authority with respect to the CBEs is unclear, undermining the efficacy of their proposal. Third, allowing voters to sign "anywhere" on the envelope while failing to provide an accessible means for them to locate a signature line destroys their privacy. Fourth, blind voters need to electronically

36

receive accessible instructions on mailing process and the text of the declaration.

Finally, there must be some means to compel the CBEs to ensure that they do what

is "requested" in order for any such changes to be effective. *See* Supp. Heitz Decl.

¶¶ 14-28 (P-51); Supp. Senk Decl. ¶ 15 (P-52); Supp. Weber Decl. ¶¶ 23-24 (P-

53); Salisbury Decl. ¶¶ 18-23 (P-54).

### b. Electronic Return Is a Reasonable Modification

35.    Plaintiffs also propose allowing blind voters to return their marked

ballots electronically (such as by email or an online portal) as a reasonable

modification to ensure that Defendants' absentee and mail-in ballot program is

accessible.

36.    Defendants' assertion that electronic return of ballots is not a neces-

sary modification because blind voters can privately and independently mail their

ballots is unsupported by the facts.  While some voters, like Mr. Drenth, may have

access to special technology allowing them to "partially" read printed information,

his situation is not reflective of all blind voters.  The evidence establishes that

some blind voters must electronically submit their ballots in order to have equal

access to the absentee and mail-in voting program because:  (a) blind voters often

do not own the printers needed to print ballots marked using an accessible ballot

marking and delivery tool;[6] (b) blind voters without printers would need to have third parties print their ballots, which nullifies their ability to vote privately and independently; (c) blind voters cannot independently assemble their ballot into the two envelopes unless they are readily distinguishable; and (d) blind voters cannot independently review the declaration and sign it. *See* FOF ## 57-67; Supp. Heitz Decl. ¶¶ 7-27 (P-51); Supp. Weber Decl. ¶¶ 12-14 (P-53); Salisbury Decl. ¶¶ 6-23 (P-54).

37.    Defendants' argument that electronic submission is not necessary because blind voters can vote in person using accessible voting machines fails to understand that the "program" at issue is the absentee and mail-in voting program—not all of Pennsylvania's voting programs. *See Lamone*, 813 F.3d at 504. Defendants cannot define the program "in a way that effectively denies" individuals with disabilities "the meaningful access to which they are entitled."

---

[6] The fact that some non-blind voters also do not own printers is irrelevant. Blind voters often do not have printers because they cannot read printed material and so have no reason to purchase a printer—not because they may be unable to afford printers. Supp. Heitz Decl. ¶ 7 (P-51); Supp. Weber Decl. ¶ 12 (P-53); Salisbury Decl. ¶¶ 11-16 (P-54). More importantly, sighted voters do not need printers to vote by absentee or mail-in ballot because they can privately and independently mark the printed ballots sent to them. By contrast, to utilize the accessible ballot marking and delivery tool Defendants promise, blind voters must be able to print out the ballots they mark on their computers. If they cannot do that, then they cannot use the tool and thus will be unable to vote by absentee and mail-in ballot.

*Alexander v. Choate*, 469 U.S. at 301; *accord Lamone*, 813 F.3d at 504; *Anderson*,

185 F. Supp. 3d at 645.  Plaintiffs have the same right to vote without going to

their local polling places as non-blind voters.[7]

38.     So, too, Defendants' suggestion that electronic return is unnecessary

because blind voters who cannot print out, assemble, and/or deliver his or her

absentee or mail-in ballot can travel to his or her polling place on election day and

vote by provisional ballot is unpersuasive.  This would eviscerate the benefit of

having the accessible ballot delivery and marking tool and deny blind voters equal

opportunity to vote by absentee or mail-in ballot without going to their polling

places.  Indeed, it would be worse because provisional ballots are paper ballots

and, thus, inaccessible. *See* Drenth Dep. at 58:20-59:5; Commw. of Pennsylvania,

*Voting in Pennsylvania*, https://www.pa.gov/guides/voting-and-

elections/#VotingataPollingPlace. And it may force blind voters to travel to polling

places amidst an ongoing pandemic.

39.     Defendants' assertion that electronic return of ballots is a fundamental

alteration because Pennsylvania law does not expressly permit it ignores the fact

that Pennsylvania law also does not expressly permit electronic delivery and

---

[7] Defendants' suggestion that blind voters who determine that they cannot
complete, print out, and submit their absentee and mail-in ballots can go to their
polling place and vote by provisional ballot is an even less accessible alternative
since provisional ballots are paper and, thus, a blind voter would not be able to
vote privately and independently.  *See* Drenth Dep. at 58:20-59:5 (P-2).

marking of ballots, yet Defendants are willing to allow that without legislative authorization.  Marks. Dep. at 231:20-232:23 (P-1).  Even if it were expressly prohibited – which it is not – state law would have to yield if it violated the ADA and RA.

40.     Finally, Defendants' contention that the ADA and RA cannot require them to allow for electronic return for blind voters because Pennsylvania law does not allow any voters to return ballots electronically reflects a misunderstanding of the ADA and RA.  Those statutes are premised on the recognition that people with disabilities may need to be treated differently than non-disabled people in order to ensure that they receive equal access to covered entities' services, programs, and activities.  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002); *Anderson v. Franklin Institute*, 185 F. Supp. 3d 628, 644-45 (E.D. Pa. 2016).  Here, the ADA's and RA's reasonable modification mandate requires Defendants to allow electronic delivery of ballots, even though it gives blind voters an option not available to non-blind voters, in order to ensure that they have the same opportunities to vote using the absentee and mail-in voting program as sighted voters can.  "[A] benefit exceeding that of the general public is necessary for [Plaintiffs] to achieve the baseline of equality."  *Anderson*, 185 F. Supp. 3d at 645.

**D.    Defendants' Justiciability Challenges to Plaintiffs'
       ADA and RA Claims Are Unavailing.**

41.     Defendants seemingly contend that Plaintiffs' claims are not ripe

because Defendants *intend* to implement an accessible ballot delivery and marking

tool for the November 2020 election.  Leaving aside that the accessible ballot

delivery and marking tool is only one aspect of Plaintiffs' ADA and RA claims,

this argument lacks merit.

42.     "A claim is not ripe for adjudication if it rests upon contingent future

events that may not occur as anticipated, or indeed may not occur at all." *Texas v.*

*United States*, 523 U.S. 296, 300 (1998).  The ripeness doctrine forecloses courts

from deciding issues that are premature for review and where the injury may never

occur, depending on facts that remain unresolved.  *See N.Y. Public Interest*

*Research Group v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003).  To assess

ripeness, the Court must assess whether the action is based on actual or imminent

injuries or, instead, on mere contingencies.  *Plains All American Pipeline L.P. v.*

*Cook*, 866 F.3d 540, 541 (3d Cir. 2017).

43.     At all times, this case has been ripe for adjudication.  At the time this

lawsuit was filed, Defendants stood in violation of the ADA and RA due to their

failure to ensure that blind voters had equal and meaningful access to their

absentee and mail-in ballot voting program.  Plaintiffs have suffered actual harm in

every election in which they have not had equal access to the program.  Defen-

41

dants, by their own admission, still have not acquired such an accessible ballot marking and delivery tool, will not permit electronic return of ballots, and will not make other necessary changes to the return and declaration processes to make the entire absentee and mail-in voting program accessible to blind voters.

44.     Even if the only issue were the implementation of an accessible ballot marking and delivery tool (which it is not), the case would remain ripe even if Defendants acquired such a tool.  Defendants trumpet this promised remedy without divulging any details on how such a tool would work and how it would ensure that blind voters throughout Pennsylvania have equal and meaningful access to the absentee and mail-in voting program.  In addition, until the tool is actually implemented in November and thereafter, there will remain open questions as to whether Plaintiffs have the access to which they are entitled under the ADA and RA.

45.     Defendants also cannot seriously contend that Plaintiffs' claims are not justiciable because their promised acquisition of the accessible ballot marking and delivery tool renders the parties' interests not sufficiently adverse.  Again, this fails to grapple with the other issues in the case.  More importantly, Defendants have never admitted that they have an obligation under the ADA and RA to ensure that blind voters have an accessible way to return marked ballots – indeed, they have denied the very proposition.  They cannot both claim the parties' positions are

42

aligned while not admitting the extent of their obligations under the ADA and RA. *Cf. Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 88 n.9 (1993) (rejecting argument that parties are not adverse where they continue to dispute the underlying issue).

46.     Defendants' ripeness challenge also is disingenuous.  Where, as here, Defendants unilaterally take action to provide some form of relief to Plaintiffs the appropriate justiciability issue is mootness.  *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (noting that the question of whether "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit" after the lawsuit is filed goes to the question of mootness).

47.     Neither Defendants' promise to implement an accessible ballot marking and delivery tool nor their promise to make limited changes to the mail and declaration processes are sufficient to moot Plaintiffs' ADA and RA claims.

48.     First, mere promises of future action, such as those offered by Defendants, are insufficient to moot Plaintiffs' claims.  *See, e.g.*, *CSI Aviation Services, Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 414 (D.C. Cir. 2011); *cf. Benjamin v. Dep't of Public Welfare*, 768 F. Supp. 2d 747, 755-56 (M.D. Pa. 2011) (holding that defendants' adoption of plan did not moot plaintiffs' ADA claims).

49.     Second, even if Defendants implement their promises, it would not moot Plaintiffs' claims.  It is well-settled that voluntary cessation of conduct will

moot a case only if it is "absolutely clear that the alleged wrongful behavior could

not reasonably be expected to recur." *See Hartnett v. Pa. State Educ. Ass'n*, 963

F.3d 301, 306 (3d Cir. 2020).  The focus in a voluntary cessation case "is on

whether the defendant made the change unilaterally and so may 'return to [its] old

ways' later on." *Id.* at 307 (citation omitted).  "[C]ourts are particularly skeptical

of mootness in voluntary cessation situations," and so defendants bear a heavy

burden proving mootness in such cases. *Id.*  Defendants identified their solutions

only after this case was filed and offer no evidence that, even if implemented, they

will continue in force to ensure equal access to blind voters. *Cf. Ali v. City of*

*Newark*, No. 15-8374 (JLL), 2018 WL 2175770, at *6 (D.N.J. May 11, 2018)

(city's adoption of new policy to provide ASL interpreters for hearings did not

moot plaintiff's ADA and RA claims because it was not clear that the new policy

sufficiently removed impediments to access to interpreters); *Nat'l Alliance for*

*Accessibility, Inc. v. McDonald's Corp.*, No. 8:12-CV-1365-T-17TBM, 2013 WL

6408650, at *5-*7 (M.D. Fla. Dec. 6, 2013) (defendants' removal of architectural

barriers did not moot case with respect to injunctive relief to assure maintenance

and future compliance); *Cottrell v. Good Wheels*, No. 08-1738 (RBK/KMW), 2009

WL 3208299, at *5 (D.N.J. Sept. 28, 2009) (defendants' rescission of policy did

not moot plaintiff's ADA claims).

44

50.     Finally, the availability of meaningful relief beyond mere acquisition of the tool and minor changes to the mail and declaration process also warrant rejection of any mootness argument.  *See Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env. Prot.*, 833 F.3d 360, 374 (3d Cir. 2016).  Defendants' promised relief will not – even if implemented – make their absentee and mail-in ballot program accessible to blind voters because those voters still will not have an accessible means to return their marked ballots.  An accessible marking and delivery tool, of course, is an important part of relief, but it is not the only part.  If blind voters can privately and independently mark their ballots but cannot privately and independently return them, they may be unable to vote and have their votes counted as sighted voters can and do and thus their rights under the ADA and RA will be violated.

51.     In addition, Plaintiffs are entitled to a remedial plan to ensure that Defendants take comprehensive action to implement the accessible ballot and delivery tool now and in the future; allow electronic delivery of marked ballots; make changes to the mailing and declaration processes to make them more accessible to blind voters; and ensure that there is publicity to blind voters about the changes, testing of the new tool, monitoring of the process to ensure full implementation, and continuing jurisdiction to ensure full compliance.

**E.      Plaintiffs Meet All Requirements for Permanent
         Injunctive Relief and Such Relief Should Include
         a Comprehensive Remedial Plan**

52.      In determining whether to issue a permanent injunction, the Court

must consider whether:  (1) the moving party has succeeded on the merits; (2) the

moving party will be irreparably injured by denial of relief; (3) the entry of a

permanent injunction will result in even greater harm to the Defendants; and (4) an

injunction would be in the public interest.  *Shields v. Zuccarini*, 254 F.3d 476, 482

(3d Cir. 2001).

53.      Plaintiffs established that Defendants have violated the ADA and RA

and, thus, have succeeded on the merits.

54.      To establish irreparable harm, a party must demonstrate that the harm

it will suffer is "'of a peculiar nature, so that compensation in money cannot atone

for it.'"  *Alliance Bank v. New Century Bank,* 742 F. Supp. 2d 532, 565 (E.D. Pa.

2010) (quoting *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)).

At the preliminary injunction stage, this Court found that, absent an interim

remedy, Plaintiffs' would suffer irreparable harm by being "effectively forced to

choose between forfeiting their right to vote privately and independently or risking

their health and safety by traveling to a polling place to vote in person" and that

"[s]uch a choice burdens" their First Amendment right to vote.  *Drenth*, 2020 WL

2745729, at *5.  "'The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Stilp v. Contino,* 613 F.3d 405, 409 (3d Cir. 2020)).  The Court's conclusions and reasoning hold true at this stage.  *See Nat'l Fed'n of the Blind v. Lamone*, No. RDB-14-1631, 2014 WL 4388342, at *15 (D. Md. Sept. 4, 2014) (granting permanent injunction in ADA and RA challenge to state's failure to implement accessible ballot marking tool), *aff'd,* 813 F.3d 494 (4th Cir. 2016).

55.     The balance of equities also favors relief.  Defendants state that they intend to purchase and implement an accessible ballot marking and delivery tool and to make certain changes to the return and declaration processes, so they cannot complain that it would be inequitable to hold them to their promise.  Moreover, the security issues raised by Defendants to challenge electronic return as a reasonable modification do not withstand analysis and so relief would not harm Defendants. *See Nat'l Fed'n of the Blind v. Lamone*, 2014 WL 4388342, at *15.

56.     The public interest weighs in favor of the injunction. The public benefits when individuals can vote privately and independently.  *Nat'l Fed'n of the Blind v. Lamone*, 2014 WL 4388342, at *15.  Moreover, Congress intended the ADA and RA to address discrimination against people with disabilities in the area of voting.  *See* 42 U.S.C. § 12101(a)(5); 29 U.S.C. § 701(a)(5).

57.     The Court has broad equitable powers to fashion an appropriate remedy for Defendants' civil rights violations.  *See Swann v. Charlotte-Mecklen-*

47

*burg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Disabled in Action*, 752 F.3d at 198. "Indeed, a district court has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'"  *Disabled in Action*, 752 F.3d at 198.

58.     A comprehensive equitable remedy must ensure not merely that Defendants sign a contract to purchase an accessible ballot marking and delivery tool, but also ensures that it is actually implemented and works effectively.  *Cf. Disabled in Action v. Bd. of Elec.*, 752 F.3d at 202-03 (upholding permanent injunction of remedial order requiring ongoing monitoring and reporting).

59.     Here, it is appropriate for the Court to issue a permanent injunction to require Defendants to ensure blind voters have equal and meaningful access to its absentee and mail-in voting program and, specifically, to:  require them to secure and implement an accessible ballot marking and delivery tool beginning with the November 3, 2020 election; to modify its mail return and declaration processes for absentee ballots beginning with the November 3, 2020 election; to allow blind voters to submit their marked ballots electronically beginning with the November 3, 2020 election; and to provide for publicizing the changes, testing, monitoring, and continuing jurisdiction through at least the end of 2021 to ensure that Defendants comply with the injunction and that the modifications are implemented and effective.

48

Respectfully submitted,

Dated:  August 7, 2020                    By:    /s/ Kelly Darr
                                                  Disability Rights Pennsylvania
                                                  Kelly Darr (PA ID 80909)
                                                  Robin Resnick (PA ID 46980)
                                                  Laura Caravello (PA ID 312091)
                                                  Disability Rights Pennsylvania
                                                  1800 J.F. Kennedy Blvd., Suite 900
                                                  Philadelphia, PA  19103-7421
                                                  215-238-8070
                                                  215-772-3126 (fax)
                                                  kdarr@disabilityrightspa.org
                                                  rresnick@disabilityrightspa.org
                                                  lcaravello@disabilityrightspa.org

                                           By:    /s/ Kobie Flowers
                                                  Brown Goldstein Levy LLP
                                                  Kobie Flowers (MD 0106200084)
                                                  Sharon Krevor-Weisbaum
                                                  (MD 8712010337)
                                                  James Strawbridge (MD 1612140265)
                                                  120 E. Baltimore St., Ste. 1700
                                                  Baltimore, MD 21202
                                                  410-962-1030
                                                  410-385-0869 (fax)
                                                  kflowers@browngold.com
                                                  skw@browngold.com
                                                  jstrawbridge@browngold.com

                                                  Counsel for Plaintiffs